IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

MICHAEL HENLEY, JR., CLEM
WILLIAMSON, SHANE
MATTADEEN and WILFRED
RIVERA,

                    Defendants.

CRIMINAL CASE NO.

1:16-CR-00151-LMM-JFK

## ORDER AND REPORT AND RECOMMENDATION

Pending before the court are Defendant Michael Henley's motion [Doc. 85] as perfected [Doc. 88] to suppress his statement made on February 14, 2016, and to suppress evidence obtained on that date, resulting from a warrantless search of his vehicle. Also pending before the court is Defendant Wilfred Rivera's motion [Doc. 156] for a bill of particulars. The Government opposes the motions to suppress and for a bill of particulars. [Docs. 181 and 202]. Defendant Clem Williamson filed a motion [Doc. 84] for severance of his trial from that of his co-Defendants which he has withdrawn [Doc. 188]. Defendant Shane Mattadeen did not file any pretrial motions.

## Henley Motions To Suppress

As noted, Defendant Henley moved to suppress the statement he made on February 14, 2016, and the evidence seized from his vehicle on the same date. [Docs. 85 and 88]. An evidentiary hearing was held on September 13, 2016, on Defendant's motions.[1] [Doc. 104]. In his post-hearing brief in support of the motions to suppress, Defendant contends that the agents conducted a warrantless search of his vehicle and that he was not asked and did not consent to the search. [Doc. 151 at 3-6]. In making these arguments, Defendant challenges the credibility of the officer who allegedly obtained the consent to search his vehicle. [Id.]. Defendant also asserts that, although he was advised of his Miranda[2] rights and, apparently, voluntarily waived his rights, his subsequent statement was not voluntary due to a threat made by that same officer. [Id. at 6-8]. In response, the Government opposes the motion to suppress evidence obtained from Defendant's vehicle on two alternative grounds, (1) that the automobile exception to the warrant requirement applies to the search or (2) that Defendant did voluntarily consent to the search. [Doc. 181 at 16-27]. And, in response to Defendant's motion to suppress his statement, the Government contends that the

_____

[1]Citations to the transcript of the hearing are: (Tr. at ).

[2]See Miranda v. Arizona, 86 S. Ct. 1602, 1630 (1966).

2

statement was not coerced. [Id. at 27-30]. Because Defendant had not addressed the automobile exception in his post-hearing brief, he was offered the opportunity to file a reply brief responding to the Government's arguments. [Doc. 190].

After consideration of the arguments, record before the court and relevant legal authorities, the court finds that Defendant's motions are due to be denied.

## I. Background Facts

For over a year, Special Agents with the Drug Enforcement Administration ("DEA"), with Special Agent Robert Norton and Task Force Officer ("TFO") Kevin Sipple acting as co-case agents,[3] conducted an investigation of a group of individuals who were committing robberies of drug dealers, for drugs and money, and who were committing other violent acts. One of the targets of the investigation was Charles Hubbard, at the time, a law enforcement officer with the City of Auburn Police Department. (Tr. at 4-5). Defendant Henley had been identified as a member of the group, and he was known to engage in violent acts. (Tr. at 5). On February 12, 2016,

---

[3]Agent Norton and TFO Sipple both had extensive law enforcement training and experience. (Tr. at 3-4, 74-75).

at approximately noon, DEA agents began monitoring a federally authorized wiretap on one of the members of the group, Martin Rosenberg.[4]  (Tr. at 6).

As the monitoring of Rosenberg's conversations began, the agents learned that he and other members of the group, particularly Defendant Henley, were engaged in surveillance of potential robbery victims.[5]  (Tr. at 6).  On February 12, 2016, the agents intercepted conversations between Defendant Henley and Rosendary discussing placing a tracking device on a Jeep belonging to one of the robbery targets and conducting surveillance at the robbery targets' apartment.  The purpose of the robbery was to steal approximately ten kilograms of cocaine believed to be in the apartment. Defendant and Rosendary discussed who would be involved, and Defendant stated that "perhaps the girl" would participate.  (Tr. at 8-10; Government Exhibits ("Gov't Exhs.") 1-2).  Rosendary discussed scenarios for gaining entry into the apartment involving Hubbard, acting as a law enforcement officer, with Hubbard and then with Defendant Henley.  Hubbard was with Rosendary during the conversation with

---

[4]Both Hubbard and Rosenberg were named as defendants in the original indictment returned on May 3, 2016 [Doc. 31], but they are not named in the superseding indictment [Doc. 107].

[5]Agents and TFOs actively conducting the investigation were in constant contact with the agents and officers monitoring Rosendary's conversations and with each other to relay information.  (Tr. at 7, 25-26, 56).

4

Defendant. (Tr. at 12-13, 15; Gov't Exhs. 3-4). The investigating agents became concerned about the threat to the robbery targets and began working to identify them and the location of the apartment in which they lived in order to prevent the robbery. (Tr. at 8, 11, 14). Based on surveillance conducted by the agents and TFOs of Defendant Henley and Rosendary, the agents determined that the robbery targets resided in the Amber Mill apartment complex, located in Duluth, Gwinnett County. However, they did not know in which building or apartment in the large complex the robbery targets resided. (Tr. at 11, 14; Gov't Exh. 16).

On February 13, 2016, the agents continued to monitor conversations between Defendant Henley and Rosendary concerning how to conduct the robbery, including a home invasion or confronting the targets when they exited the apartment and forcing them back inside, and they discussed information Defendant Henley was receiving from unidentified sources of information about the robbery targets. During this conversation, Defendant and Rosendary discussed "the girl" and what she knew about the drugs and that she was on their team. The discussion indicated that the girl might be inside the apartment and accompany one of the robbery targets when he left the apartment. (Tr. at 15-18; Gov't Exh. 5). The agents believed that Defendant Henley and Rosendary were serious about committing the robbery. (Tr. at 19). Rosendary and

5

Defendant continued to discuss whether Hubbard, who wanted absolute assurance that the cocaine was inside the apartment by having "the girl" take a photograph of the drugs, would participate. Defendant Henley explained that the girl could not take a photograph or ask questions because the robbery targets would be suspicious. Defendant and Rosendary discussed how, if Hubbard did not participate, to gain entry into the apartment without Hubbard's assistance. Defendant Henley advised that he was ready to go with or without Hubbard. (Tr. at 20-23; Gov't Exhs. 6-7). By now the agents had the apartment number for the robbery targets and were conducting surveillance of Defendant Henley and Rosendary as they traveled in Defendant's BMW to the Amber Mills apartment complex and parked near the robbery targets' apartment. (Tr. at 23-24; Gov't Exh. 7). Defendant Henley discussed drawing a robbery target out of the apartment, who would be with "his girl," and then forcing them back inside. (Tr. at 27-29; Gov't Exh. 8). He also mentioned that "she," that is, "the girl," was calling him. (Gov't Exh. 8).

On February 14, 2016, Defendant Henley and Rosendary discussed committing the robbery that day, mentioning that somebody might have to be shot. Defendant Henley advised that he had to have some money; so, he had to commit the robbery. He stated that, even if he had to act alone, he was going to commit the robbery that

day.  (Tr. at 29-32; Gov't Exhs. 9-10).  Again, he stated that he would wait for one of the robbery targets to exit the apartment and force that person back inside and that he would "smoke," that is, shoot, anyone who resisted.  (Tr. at 32-33; Gov't Exh. 10).  According to the agents, their concern intensified because they believed that Defendant was going to act and act violently if necessary.  (Tr. at 33).  Around 5:13 p.m., Defendant Henley spoke with Rosendary, saying that he would go alone, that he was tired of waiting and that one of the target's vehicles was not at the apartment.  He explained that he was not worried about controlling the targets.  He said, "One of them I got control over.  The other two (2) got to do what I say, and that's that."  He told Rosendary that he needed a "joint," which the agents understood to be a firearm, and zip ties.  (Tr. at 33-35; Gov't Exh. 11).  The agents conducting surveillance of Defendant Henley observed him drive to his apartment and enter; he then exited the apartment and placed an unidentified item into the trunk of his BMW before leaving. (Tr. at 35).

Agent Norton decided to warn the robbery targets and remove them from the apartment.  He met with them inside their apartment and found three adults and four or five children.  (Tr. at 26-37, 56).  He did not expect Defendant to be immediately arriving at the complex.  (Tr. at 56).  While the agents were inside the apartment, at

7

approximately 8:49 p.m., another conversation between Defendant Henley and Rosendary was intercepted. (Tr. at 36; Gov't Exh. 12). Defendant Henley stated that he would "run down on" one of the targets and force him back inside the apartment then "zip everything up." He told Rosendary that he had the zips, and Rosendary said that he had the "shirt," which the agents understood to be a firearm. (Tr. at 36-38; Gov't Exh. 12).

While Agent Norton and other law enforcement officers were inside the apartment, additional agents and officers, including TFO Sipple, were outside conducting surveillance to monitor Defendant's and Rosendary's anticipated arrival at the complex.[6] (Tr. at 38, 75, 88). Accordingly, on the evening of February 14, 2016, agents and TFOs were located in the parking lot of the Amber Mill complex awaiting Defendant's arrival. (Tr. at 75-77; Gov't Exh. 16). When Defendant arrived at the complex, around 9:00 p.m., he parked his BMW in the slot immediately adjacent to the breeze way to the robbery targets' apartment. Believing Defendant was there to attempt to commit the robbery, and not just conducting more surveillance of the

---

[6]Earlier in the day, a tracking device had been placed on Rosendary's Jeep to assist with surveillance. He was still at his residence. (Tr. at 48-52, 87-88). Although his conversations with Defendant Henley indicated that he was coming to the Amber Mill apartments with a firearm, as of the time Defendant was detained, Rosendary had not left his residence. (Tr. at 50-52).

robbery targets, the agents and TFOs decided to detain Defendant and the female passenger in the BMW.[7] (Tr. at 42, 54-55, 57-58, 60-61, 77-80; Gov't Exh. 17). Defendant and his passenger were ordered out of the BMW; the agents removed the female passenger first. (Tr. at 80-81).

Apparently due to a malfunction with the lock on the driver's side door, there was a delay in removing Defendant from the vehicle. And, after he exited, Defendant attempted to reach back into the vehicle. He was ordered to stop, forced to the ground by a number of agents and TFOs and handcuffed behind his back. There was some initial difficulty with getting Defendant to comply, and he was told to listen to and to obey the officers. (Tr. at 81-84). The agents and officers were armed with weapons - including some rifles - drawn until Defendant was secured. At that time, the firearms were holstered or put away. (Tr. at 82-85). Once Defendant complied and was

---

[7]At this time, the agents and officers did not have evidence that Defendant was in possession of a firearm. (Tr. at 53-55). And, although Rosendary had not left his residence, given the time of night, he was only twenty minutes from Defendant Henley's location at the apartment complex. (Tr. at 57-58).

AO 72A
(Rev.8/82)

secured, he was assisted in standing-up and there were no more problems.[8]  (Tr. at 83-84, 90).

At this time, TFO Jason Carter, a City of Alpharetta Police Department Detective, who had been in the apartment with Agent Norton, exited and walked over to where Defendant was standing.  (Tr. at 93, 101).  TFO Carter identified himself and stated something along the lines that obviously the investigation was bigger than Defendant suspected.  He also asked if Defendant was okay, was he injured and had anyone hurt him?[9]  (Tr. at 93-94).  Defendant responded that he was fine but that the handcuffs were tight.  The TFO adjusted the handcuffs.  (Tr. at 94).  Defendant's demeanor was surprised, and he was asking questions about what was going on.  (Tr. at 93).  Because Defendant wanted to talk, TFO Carter decided to advise Defendant of his <u>Miranda</u> rights using a DEA issued card.  (Tr. at 94-96; Gov't Exh. 15).

---

[8]Although Agent Norton checked outside after Defendant was detained to be sure the situation was under control, he did not remain outside but returned to the apartment.  (Tr. at 61-62).

[9]TFO Carter was not directed to stand with or speak to Defendant or to try to obtain consent to search the BMW.  Because he had not participated in the detention of Defendant, he said he felt comfortable speaking with and checking on Defendant's welfare.  In these situations, an agent or officer usually remains with a suspect.  (Tr. at 101-03).

He read to Defendant the exact wording on the card:

Before we ask you any questions, you must understand:

- You have the right to remain silent.

- Anything you say can be used against you in court.

- You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.

- If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

(Gov't Exh. 15). The agent then asked, "Do you understand?" Defendant responded, "Yes." And he asked Defendant, "Are you willing to answer some questions?" Defendant responded, "Sure." (Tr. at 96-97; Gov't Exh. 15).

The TFO, not being familiar with the investigation, did not ask Defendant any case specific questions; instead, he engaged in general conversation or "chit-chat" with Defendant for approximately forty-five minutes. (Tr. at 96-97). Shortly after advising Defendant of his rights, about five minutes into the conversation, the TFO asked Defendant if the BMW was his vehicle, and when Defendant responded, yes, asked "him if there was anything in there that shouldn't be, and I asked such as guns, bombs, drugs, things of that nature." (Tr. at 97, 108). Defendant responded, "[N]o, absolutely not, you can search it." (Tr. at 97). The agent confirmed by asking, "[A]re you giving

11

us permission to search your vehicle." Defendant stated, "I am."[10]  (Tr. at 98).  TFO

Carter said that he advised Defendant that he would stand with him and to let the TFO

know if he, Defendant, changed his mind about the search.  (Tr. at 98).  The TFO

advised the agents and officers standing in the parking lot that Defendant had

consented to the search but he did not recall specifically who he spoke to or who

conducted the search.  (Tr. at 105-06, 108).  The TFO did not make Defendant any

promises or threaten him - nor hear anyone else do so - to obtain consent to search the

BMW.  (Tr. at 98-99).  The TFO was casually dressed with his firearm holstered.  (Tr.

at 98).  He remained chatting with Defendant, about twenty to thirty feet from the

BMW, while the search was conducted.  (Tr. at 99).

At some point, while the search of the BMW was still being conducted,

Defendant was seated in the back seat of Georgia State Patrol Trooper Ian Moreman's

vehicle.  (Tr. at 111-12).  The Trooper, in uniform with his firearm holstered, first

patted Defendant down for weapons and then advised Defendant that he could stretch

_____

[10]TFO Carter did not make any notes of his conversation with Defendant nor
prepare a report reflecting advising Defendant of his rights or obtaining Defendant's
consent.  (Tr. at 102, 109-10).  He recalled advising Agent Norton, when the agent
exited the apartment later, that Defendant had consented to the search.  He did not
review that agent's report and does not know what information the agent included in
the report.  (Tr. at 107, 110).

AO 72A
(Rev.8/82)

out on the back seat to have enough room. (Tr. at 112-13). The Trooper checked that the temperature in the patrol vehicle, left running with the heater on and windows rolled up, doors locked, was good for Defendant, and left Defendant alone in the vehicle. (Tr. at 113-14). He did not threaten Defendant or make him any promises. (Tr. at 115). Because Defendant was asking questions about what going on, the Trooper advised Defendant that he would have someone speak to him. (Tr. at 115). Agent Norton was told that Defendant wanted to talk to someone and exited the apartment to do so. (Tr. at 39).

Before speaking with Defendant, Agent Norton observed that the BMW was still being searched, and he was advised by and shown by TFO Paul Fergosi what had already been seized from the vehicle, including, a package of zip ties, a black ski mask, and components for a tracking device that matched the tracker that Defendant had placed on the robbery target's vehicle. (Tr. at 38-39, 63-67). Agent Norton, confirming that his report does not include information about how the agents and TFOs gained entry into the BMW,[11] stated that he did not "need to ask" the agents how they entered the vehicle because he "knew why and how they were in the car. They were

---

[11]The report identified TFO Joe Lecour and TFO Fergosi as conducting the search and listed the items seized. (Tr. at 64-66).

in the car because we had just placed Mr. Henley in custody, and we were following up on what we believed was happening." (Tr. at 67). Agent Norton was not asked if he spoke to TFO Carter about the vehicle search. (Tr. at 63-67).

Agent Norton then spoke to Defendant as he remained seated and handcuffed in the backseat of the patrol vehicle. (Tr. at 39). The agent, who was casually dressed with his firearm holstered, identified himself as the case agent for the investigation and stated he understood that Defendant wanted to talk to someone. The agent confirmed that Defendant had been advised of his <u>Miranda</u> rights and summarized the rights again for Defendant. (Tr. at 40-41). He did not make Defendant any promises or threaten him; Defendant did not appear to be under the influence of drugs or alcohol. (Tr. at 41). Defendant's demeanor was "very talkative," and the agent "basically listened as" Defendant spoke. (Tr. at 41-42). They spoke for approximately fifteen minutes. (Tr. at 42). Defendant was then released, after the robbery targets had gathered up belongings and left the area, around 11:30 p.m. (Tr. at 42-44).

Shortly after Defendant was released, around 11:54 p.m., he spoke with Rosendary on the telephone advising Rosendary that, as soon as he arrived at the apartment complex, DEA agents had "run down on" him, locked "her up" and put him in the back of a police vehicle to talk to him. He claimed that he was advised that he

14

would have to see a Federal Judge on Monday or Tuesday and that he had responded that he had not done anything "on that . . . level" and asked what the agents were talking about.[12] (Tr. at 45-46; Gov't Exh. 13). Defendant advised Rosendary that if Rosendary or Hubbard had been there, they would have been "done." He also advised that the agents were in the "crib," that is, the robbery targets' apartment. He and Rosendary thought that the DEA agents were actually there investigating the robbery targets. (Gov't Exh. 13). Defendant Henley advised that he "knew [the agents] were bullshitting and it wasn't nothing" involving him; he was told that it was case of mistaken identity. (Gov't Exh. 13).

Finally, on February 15, 2016, around 5:30 p.m., Defendant spoke again to Rosendary about the events of the night before. (Tr. at 46-47; Gov't Exh. 14). Defendant explained that the agents took photos of and seized the zip ties and ski mask but that he had explained why he had the items. (Tr. at 46; Gov't Exh. 14). He again described how the agents immediately surrounded the BMW as soon as he parked and

---

[12]Later in the conversation with Rosendary, Defendant Henley appears to be talking about a black DEA agent, who was playing the "good cop" but wanted Defendant "to flip" and advised Defendant that "if you don't tell us . . . you going to jail" and that he does not "want to see that Federal Judge . . . Monday, Tuesday." Defendant said he replied that he had not done anything but wanted to get high and that he "don't know nothing about nothing." (Gov't Exh. 13).

AO 72A
(Rev.8/82)

removed the female, manhandling her, and then removed him - telling him to get on the floor. Defendant said that "about 10 cops jumped on his back" and that he was asked if he could feel the Glock on his back. (Tr. at 46-47; Gov't Exh. 14). Defendant said he told them that they had the wrong person and discussed with Rosendary believing that the agents were waiting on someone else driving a BMW to arrive. (Gov't Exh. 14). Defendant again mentioned being told about seeing a Federal Judge Monday or Tuesday. (Gov't Exh. 14). Defendant also told Rosendary that he kicked the window of the patrol vehicle to get the black DEA agent's attention, who responded that "it was mistaken identity and the head guy would talk to him . . . ." (Gov't Exh. 14). Rosendary and Defendant both agreed that they were not worried about the incident because neither one of them "did . . . the shit to be on the radar of the FBI or DEA." (Gov't Exh. 14).

Defendant Henley testified at the hearing. On direct, he stated that he was present on February 14, 2016, at the apartment complex. When asked if "[a]t any point during the time that [he was] in custody of law enforcement agents, [he] ever [gave] permission to any officers to search [his] vehicle[,]" Defendant responded, "No." (Tr. at 118-19). On cross-examination, Defendant was asked if anyone threatened him. He responded that the agent who had given him <u>Miranda</u> rights came to the patrol vehicle

16

while he was sitting inside, after the search, "and was like you need to tell me . . . he's like I'm going to have you see the judge Monday or Tuesday . . . ." (Tr. at 119-20). Defendant said he asked "for what, and he was like you better let me know or tell me where it's at or whatever, and [Defendant] wasn't sure what he was talking about . . ." (Tr. at 119). Defendant also said that he responded to the officer, "I'm like I don't know what you're talking about." (Tr. at 119). And when asked if anyone made him any promises, Defendant responded, "No, he just got mad and left and said you'll be seeing a judge Monday." (Tr. at 120). Defendant said he was told this before he spoke to Agent Norton. (Tr. at 121).

Additional facts will be set forth as necessary in discussion of the motions to suppress.

## II.    Discussion

Defendant seeks to suppress evidence seized as a result of a warrantless search of the vehicle, a BMW, he was operating on February 14, 2016, and statements that he made while being detained on that date. [Docs. 85 and 88]. As to the search of the BMW, Defendant contends that he was not asked for consent and did not consent to the search arguing that the witness, TFO Carter, who testified to Defendant's consent

17

is not credible[13] and contending that the government lacked probable cause to search the BMW. [Doc. 151 at 3-5; Doc. 190]. The Government opposes the motions to suppress arguing that the totality of the circumstances known to the agents and officers established probable cause for the search of the BMW or, in the alternative, that Defendant voluntarily consented to the search. [Doc. 181 at 16-27]. The Government further argues that Defendant's post-<u>Miranda</u> statements were voluntary and are admissible. [<u>Id.</u> at 27-32]. Because Defendant relies in part on arguments that the testimony of TFO Carter is not credible and should not be considered by the court, the court will first address the witness credibility determination.

a.    **Credibility**

Defendant contends that the credibility of TFO Carter is undermined by his failure to record in writing the verbal consent and further by the fact the official report of the events on February 14, 2016, authored by Agent Norton, does not state that Defendant consented to the search. For these reasons, as discussed in more detail *infra*, Defendant argues that the court should disregard TFO Carter's testimony about consent and credit Defendant's denial that he consented to a search of the BMW.

---

[13]Defendant does not otherwise challenge the validity of the alleged consent to search the BMW. [Doc. 151 at 3-6].

AO 72A
(Rev.8/82)

[Doc. 151 at 6]. "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002). In weighing the credibility of a witness, the court takes "into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand." Id. at 750; see also United States v. Wein, 2006 WL 2128155, at *3 (W.D. Pa. July 27, 2006) (noting that "customary techniques to ascertain the credibility of the witnesses" included, but was "not limited to: appearance and conduct of each witness, the manner in which he testified, the character of the testimony given, his intelligence, motive, state of mind, and demeanor while on the stand"). And, unless the evidence "'is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it" or unless the factfinder's determinations appear to be "'unbelievable[,]'" a reviewing court should accept those findings of fact. Ramirez-Chilel, 289 F.3d at 749 (citations omitted); accord United States v. Griffith, 397 Fed. Appx. 613, 617-18 (11th Cir. 2010).

The court has evaluated the testimony of TFO Carter and Defendant Henley based on these guidelines and finds TFO Carter's testimony regarding consent to

search the BMW credible and does not accord any weight to Defendant's self-serving denial about consent to search the BMW. Defendant focuses entirely on the lack of any documentation of the verbal consent to challenge TFO Carter's testimony. That lack of documentation is understandable under the circumstances encountered by the agents and officers the evening of February 14, 2016. The circumstances surrounding Defendant's arrival at the Amber Mills apartment complex and facing the agents were fluid and, frankly, tense, that is, believing that Defendant intended to commit a strong-arm robbery, lacking certainty when he and any other participants would arrive and about his actions when he did arrive, and having concerns for the safety of the intended robbery targets. A number of law enforcement agents representing various agencies were at the scene that evening due to these circumstances. (Tr. at 7-38, 48, 54-56, 58-60; Gov't Exhs. 1-11).

Upon Defendant's arrival, one group of agents and officers detained him, using force due to Defendant's failure to initially comply with law enforcement directives, before TFO Carter, who was present that evening but not actively involved in the ongoing investigation, exited the robbery targets' apartment and decided to engage Defendant in conversation. (Tr. at 35-38, 56-61, 75, 77-85, 88, 93-94, 97, 101-04). The consent to search the BMW, occurring after Defendant was advised of his <u>Miranda</u>

rights,[14] flowed from the TFO's inquiries generally about Defendant's ownership of the BMW and whether any dangerous items were in the vehicle. (Tr. at 97-98). Instead of simply answering, no, Defendant responded by telling TFO Carter, "[N]o, absolutely not, you can search it." (Tr. at 97). The TFO was not seeking consent when he asked about the vehicle's contents; however, he confirmed Defendant's consent to search once given by Defendant. (Tr. at 98). The TFO advised other agents and officers present that Defendant had consented, and the search began. (Tr. at 105-06, 108). The TFO had no reason to lie about his conversation with Defendant Henley.

Although Defendant denies that he gave consent and although he remained present during the search, there is no evidence in the record that he objected to the search being conducted or questioned why his vehicle was being searched that evening and he did not claim to have done so in his hearing testimony. (Tr. at 40-42, 98-99, 108, 118-20). Additionally, while complaining about other events that occurred that evening to Rosendary, he did not complain after the fact about the search of his BMW; instead, he merely advised Rosendary that the zip ties and ski mask were seized and photographed. (Tr. at 45-47; Gov't Exhs. 13-14).

---

[14]Defendant does not dispute that TFO Carter advised him of his rights. (Tr. at 94-97, 110, 119).

TFO Carter's failure to document the verbal consent is reasonable given the fact that he did not approach Defendant to obtain consent. Likewise, he did not document the fact that he gave Defendant <u>Miranda</u> rights, another unintended occurrence due to Defendant wanting to engage in conversation about the case with the TFO. (Tr. at 93-97, 101-04, 109-10). The TFO's actions are further explained by his limited role in the events of February 14, 2016. He was not familiar with the investigation. (Tr. at 97). Nonetheless the TFO also testified that he related the fact of the consent to Agent Norton who was tasked with writing the report.[15] (Tr. at 102, 106-07, 110). And, under the circumstances, Agent Norton's failure to note TFO Carter's statement in his report or to otherwise recall that statement is not surprising. Agent Norton testified that, when exiting the apartment to speak to Defendant, he observed that the BMW was being searched, and he was shown the items seized from the vehicle. (Tr. at 38-39, 63-67). When asked why his report did not recount how the agents gained entry, Agent Norton stated that he did not "need to ask" the agents how they entered the vehicle because he "knew why and how they were in the car. They were in the car because we had just placed Mr. Henley in custody, and we were following up on what we believed

---

[15]Agent Norton was not asked if he spoke to TFO Carter about the vehicle search. (Tr. at 63-67).

22

was happening." (Tr. at 67). Although not artfully stated, the court understands the agent's testimony to be that he did not ask about the basis for the entry into the BMW because, under the circumstances, there was probable cause to believe that Defendant had arrived to commit the robbery and that items related to that conduct, such as, the zip ties, would be found inside the BMW.

The court observed the testimony of Agent Norton, TFO Carter and Defendant. The lack of any documentation of Defendant's consent to search is not suspicious and is explained by the events of February 14, 2016; therefore, the mere lack of documentation does not undermine the TFO's testimony which is otherwise credible.

### b. BMW Search

As noted, Defendant's only challenge to consent to search the BMW is that no consent was given, at all. He does not take issue with any other circumstances surrounding consent to search the BMW. For example, Defendant does not contend that he was unlawfully detained, that he was threatened or coerced to give consent or that the agents made promises to him in order to secure the consent. [Doc. 151 at 3-6]. And the facts establish that Defendant voluntarily consented to a search of the BMW.

"It has been long recognized that police officers, possessing neither reasonable suspicion nor probable cause, may nonetheless search [a vehicle] without a warrant so

23

long as they first obtain the voluntary consent [for the search]." United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989) (citing Schneckloth v. Bustamonte, 93 S. Ct. 2041 (1973)); accord United States v. DeJesus, 435 Fed. Appx. 895, 901 (11th Cir. 2011) (same). "Whether a suspect voluntarily gave consent to a search is a question of fact to be determined by the totality of the circumstances." Id. at 798 (citing Schneckloth, 93 S. Ct. at 2059); see also United States v. Nuyens, 17 F. Supp. 2d 1303, 1306 (M.D. Fla. 1998) ("Voluntariness of consent is a question of fact, and the Court must look to the totality of the circumstances."). "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." Blake, 888 F.2d at 798 (citing United States v. Massell, 823 F.2d 1503, 1507 (11th Cir. 1987)); see also United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001) ("A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'") (citation omitted).

The Eleventh Circuit Court of Appeals affirmed in United States v. Acosta, 363 F.3d 1141 (11th Cir. 2004), that "determining whether consent was 'voluntary is not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis.'" Id. at 1151 (quoting Blake, 888 F.2d at 798). In conducting

this case-by-case analysis, factors considered by courts in assessing voluntariness include, but are not limited to: "'voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.'" Blake, 888 F.2d at 798 (citations omitted); see also Purcell, 236 F.3d at 1281 (same). However, "the government need not establish [a defendant's] knowledge of the right to refuse consent 'as the *sine qua non* of an effective consent.'" United States v. Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999) (quoting Ohio v. Robinette, 117 S. Ct. 417, 421 (1996)); accord United States v. Brown, 223 Fed. Appx. 875, 880 (11th Cir. 2007) ("the government is not required to prove that the defendant knew he had the right to refuse to consent, and a defendant's lack of knowledge of this right is not dispositive, but is just one factor to consider in evaluating the totality of the circumstances"). "'[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of upholding what appears to be a voluntary consent.'" United States v. Alim, 256 Fed. Appx. 236, 239 (11th Cir. 2007) (quoting United States v. Jones, 475 F.2d 723, 730 (5th Cir. 1973)).

The facts establish that Defendant voluntarily consented to a search of his vehicle. Although Defendant was being detained and was handcuffed, by the time TFO Carter spoke with him, the scene was secure, firearms had been holstered or put away and Defendant denied being harmed or injured. (Tr. at 83-86, 93-94, 98-99, 102-03). TFO Carter approached Defendant and began a general conversation with him but advised Defendant of his Fifth Amendment rights, when Defendant indicated that he wanted to discuss what was going on. (Tr. at 93-97). TFO Carter did not ask Defendant for consent to search the BMW; instead, Defendant, responding to an inquiry about whether dangerous items were in the BMW, denied such items being in the vehicle and volunteered that the officer could search.[16] (Tr. at 97-98). TFO Carter confirmed Defendant's permission to search and explained that Defendant, who would

---

[16]As pointed out by the Government, Defendant, being aware that firearms, bombs and drugs were not in the BMW – and probably, at the time, having no concerns about the agents and officers locating the zip ties, ski mask and tracking device parts - would have had no reason to refuse consent to search. See Blake, 888 F.2d at 798 (a factor weighing in favor of finding a voluntary consent is "'the defendant's belief that no incriminating evidence will be found'") (citation omitted); and see United States v. Pineda, 2012 WL 2906758, at *38 (N.D. Ga. June 4, 2012) (addressing the defendant's credibility in denying that he was asked for consent to search, the court stated that the defendant "conceded . . . that he had nothing to hide in the residence, such as drugs or firearms, which would have caused him to decline consent for fear of those items being located"), report and recommendation adopted by 2012 WL 2907447 (N.D. Ga. July 16, 2012).

AO 72A
(Rev.8/82)

be watching the search, could change his mind at any time, thereby indicating to Defendant that he could refuse consent to search. (Tr. at 97-98). Defendant was cooperative. The officer did not threaten or make promises to Defendant. (Tr. at 98-99). And Defendant does not allege any coercive or threatening comments related to the consent. (Tr. at 118-20). Defendant's consent was voluntary.

And, even if Defendant had not consented to a search of the BMW, the search was lawful. Although as a general rule, the Fourth Amendment requires police officers to obtain a warrant before conducting a search, see California v. Carney, 105 S. Ct. 2066, 2069 (1985), in Carroll v. United States, 45 S. Ct. 280, 285 (1925), the Supreme Court established an exception to the warrant requirement for searches of automobiles and other moving vehicles. Under the "automobile exception," "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." Pennsylvania v. Labron, 116 S. Ct. 2485, 2487 (1996); see also United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006) (indicating that "readily mobile" means "operational"). No separate exigent circumstances need to be shown. See Maryland v. Dyson, 119 S. Ct. 2013, 2014 (1999); United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003) ("[T]his Court made it clear that the requirement of exigent circumstances is satisfied

27

by the ready mobility *inherent* in all automobiles that reasonably appear to be capable of functioning.") (quoting United States v. Nixon, 918 F.2d 895, 903 (11th Cir. 1990)) (internal quotation marks omitted; emphasis in original). There is no dispute that the BMW was mobile having just arrived at the apartment complex. (Tr. at 37-38, 75-77).

The validity of the search, accordingly, turns on whether there was probable cause to believe the BMW contained contraband or evidence of a crime. Dyson, 119 S. Ct. at 2014; see also United States v. Lindsey, 482 F.3d 1285, 1293 (11th Cir. 2007) ("The key issue here is whether the police had probable cause for the search and seizure of the vehicle."). "Probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005) (citations and internal quotation marks omitted). Based on the totality of the circumstances known to the agents and officers the evening of February 14, 2016, there was probable cause to believe that Defendant's BMW would contain evidence of the attempt to rob the occupants of the apartment located at the Amber Mills complex.

As background, DEA agents and TFOs had been investigating for over a year the group of individuals, which included Defendant Henley, who were committing

28

robberies of drug dealers. This group had engaged in violent criminal conduct. (Tr. at 4-5). Specifically, on February 12, 2016, a court authorized wiretap on another participant in the group, Rosendary, resulted in the agents and officers immediately becoming aware that members of the group, including Defendant, were targeting individuals residing in the Amber Mills apartment complex to rob them of money and a quantity of cocaine. (Tr. at 6-8; Gov't Exh. 1). On February 12 and 13, 2016, Defendant Henley and Rosendary engaged in conversations about surveillance of the targets, including placing a tracking device on a vehicle operated by one of the targets and traveling to the apartment complex. (Tr. at 8-11; Gov't Exhs. 1-8). Defendant and Rosendary, and sometimes Hubbard, the law enforcement officer participant in the group, discussed various ways to commit the robbery appearing to settle on a home invasion scenario involving Defendant waiting for a target to leave the residence, who would be accompanied by "the girl" from whom Defendant was receiving information and who knew the robbery targets, forcing the target back inside and using whatever force was necessary to obtain the money and/or drugs. (Tr. at 12-29; Gov't Exhs. 3-8).

On February 14, 2016, Defendant Henley and Rosendary continued to discuss committing the robbery that day, including mentioning that somebody might have to be shot. Defendant Henley advised that he had to have some money; so, he had to

29

commit the robbery. He stated that, even if he had to act alone, he was going to commit the robbery that day. (Tr. at 29-32; Gov't Exhs. 9-10). Again, he stated that he would wait for one of the robbery targets to exit the apartment and force that person back inside and that he would "smoke," that is, shoot, anyone that resisted. (Tr. at 32-33; Gov't Exh. 10). Around 5:13 p.m., Defendant Henley spoke with Rosendary, saying that he would go alone, that he was tired of waiting and that one of the target's vehicles was not at the apartment. He stated that he could control the situation indicating that he would have control over one of the individuals and that the others would do what he said.[17] He told Rosendary that he needed a "joint," which the agents understood to be a firearm, and zip ties. (Tr. at 33-35; Gov't Exh. 11). The agents conducting surveillance of Defendant Henley observed him drive to his apartment and enter; he then exited the apartment and placed an unidentified item into the trunk of his BMW before leaving. (Tr. at 35). At approximately 8:49 p.m., another conversation

---

[17]Defendant Henley apparently intended for "the girl" who was on the team and providing information to get into the apartment and then leave the apartment along with one of the robbery targets. He repeatedly mentioned "the girl" being with the robbery target forced back into the apartment (Gov't Exhs. 5 and 8) and appeared to be referring to "the girl" when he advised Rosendary that he could handle the robbery alone because "[o]ne of them [exiting the apartment] I got control over" (Gov't Exh. 11).

AO 72A
(Rev.8/82)

between Defendant Henley and Rosendary was intercepted.[18] (Tr. at 36; Gov't Exh. 12). Defendant Henley stated that he would "run down on" one of the targets and force him back inside the apartment then "zip everything up." He told Rosendary that he had the zips, and Rosendary said that he had the "shirt," which the agents understood to be a firearm. (Tr. at 36-38; Gov't Exh. 12). Shortly thereafter, Defendant arrived at the complex, around 9:00 p.m., and he parked his BMW in the slot immediately adjacent to the breeze way to the robbery targets' apartment. (Tr. at 37-38, 60-61, 75-77). Based on these facts, "there [was] a fair probability that contraband or evidence of" Defendant's attempt to commit a robbery at the apartment complex would be found in the BMW, that is, the zip ties that Defendant said he had and stated would be used in commission of the robbery. Magluta, 418 F.3d at 1182.

Defendant does not contest that *before* he arrived at the apartment complex, there was probable cause to conduct a warrantless search of his vehicle. [Doc. 190 at 1]. Instead, he argues that "probable cause was dispelled between the time [Defendant] was detained and the time his vehicle was searched" because of the "surprise

---

[18]The agents and officers were concerned enough about Defendant carrying out the robbery that they were at the apartment of the robbery targets informing them of the threat and ensuring that they were safe as well as being present outside the apartment to watch for Defendant's arrival and prevent him from acting. (Tr. at 19, 21, 29, 33, 34-35, 37-38, 75-78).

31

appearance of the female passenger changed the entire circumstances of the criminal investigation." [Id. at 1-2 (emphasis omitted)]. Defendant's contention does not undermine the reasonableness of the agents' and officers' conclusion regarding Defendant's intent that evening nor alter the import of his statement to Rosendary that he had the zip ties to be used to "zip everything up" once in the apartment. (Tr. at 30-37, 44, 54-58, 60; Gov't Exhs. 9-12).

First, the fact that a female was with Defendant was not really surprising given the number of discussions between Rosendary and Defendant about "the girl" member of the team and her involvement in the planned robbery. (Tr. at 9, 15-16, 20-22, 27-28; Gov't Exhs. 1, 5, 6, 8 and 11). In fact, the agents would have been reasonable to conclude that "the girl" would play a significant role in Defendant's home invasion scenario, that is, she would be with the robbery target confronted by Defendant when he forced his entry into the apartment. (Tr. at 15-16, 20-22, 27-28; Gov't Exhs. 5, 8 and 11). Defendant may have planned to act "alone," that is, without Rosendary or Hubbard, but his plans did involve the participation of a female.[19] Accordingly a female's presence with Defendant arguably added to the probable cause equation.

_____

[19]And the court notes that any conversations between Defendant and "the girl" about the planning for the home invasion were not being monitored and, therefore, unknown to the agents and officers.

Likewise Defendant's arguments that the agents should have weighed any information provided by the female passenger, when there is no evidence that she provided any information, and should have considered Defendant's explanation for why he was at the complex with the female before conducting the search are not persuasive. [Doc. 190 at 2-3]. Defendant merely speculates that the female offered any credible information about the plans for that evening. And Defendant's explanation about his presence at the apartment complex, that is, just hanging out with the female to smoke dope and hopefully have sex, would have rightly been rejected as a lie to cover his true reason.[20] And, in fact, Defendant's false statements, if considered before deciding to search the BMW, would have contributed to and not detracted from probable cause. See United States v. Humphrey, 930 F.2d 919, 1991 WL 53288, *4 (6th Cir. April 11, 1991) (Noting that the defendant's repeated lies to the officer contributed to the finding of probable cause to search the vehicle, the court stated, "Some of the strongest inferences in law are drawn from lies, and courts routinely instruct juries that they may draw the inference of consciousness of guilt

_____

[20]Defendant cites to "(Doc. 104-41-19)" in support of his argument which is a vague reference to Defendant's trying to explain to Agent Norton why he was at the apartment complex with the female. (Tr. at 41, line 19-22). Defendant provides more details about the explanation offered to Agent Norton in his conversation with Rosendary after-the-fact which the court references. (Gov't Exh. 13).

AO 72A
(Rev.8/82)

from proof of suppression of evidence or the making of false exculpatory statements."); United States v. Lepore, 2016 WL 4975237, at *2 (N.D. Ga. September 19, 2016) ("False exculpatory statements may be used as evidence of consciousness of guilt. . . . [Such] statements suggesting guilt are typically offered to police or other investigating officials."); United States v. Russell, 2007 WL 1712794, *3 (W.D. Mich. June 13, 2007) (included in the facts supporting a finding of probable cause was the defendant's attempt to disassociate himself from the vehicle).

The court also notes that the agents and officers were conducting an investigation of individuals, including Defendant Henley, who had actually committed violent robberies of targets believed to be in possession of drugs and money, and not an investigation involving a group who just talked about committing crimes but had never acted. They had no reason to believe that Defendant did not intend to commit the robbery and had in his possession at least some of the means to do so. (Tr. at 4-5, 16-18, 72-73). The search of the BMW was lawful.

For these reasons, the court finds that Defendant's Fourth Amendment rights were not violated by the warrantless search of the BMW and recommends that Defendant's motions to suppress evidence be denied.

34

### c. Voluntariness of Statement

Defendant contends that while Defendant was being detained but not under arrest, and after twice being advised of his <u>Miranda</u> rights, he made a statement that was not voluntary because TFO Carter "told him, in essence, that he better make a statement or he would be seeing a judge." [Doc. 151 at 7]. Defendant alleges that TFO Carter "overreached when he threatened [Defendant] with a court appearance unless he made a statement" and, accordingly, Defendant's statement to Agent Norton was coerced.[21] [<u>Id.</u>]. The Government contends that the actual testimony in this case does not support Defendant's claim that he was forced to choose between talking and seeing a federal judge and that, in any event, the evidence does not support a finding that Defendant's statement was involuntary. [Doc. 181 at 27-32].

---

[21]Defendant likens the facts before the court to a situation under <u>Garrity v. New Jersey</u>, 87 S. Ct. 616 (1967). However, the facts in <u>Garrity</u> are inapposite to those before this court. In <u>Garrity</u>, the appellants, public employees, sought to suppress statements that were given to investigators after they were "warned (1) that anything [they] said might be used against [them] in any state criminal proceeding; (2) that [they] had the privilege to refuse to answer if the disclosure would tend to incriminate [them]; but (3) that if [they] refused to answer [they] would be subject to removal from office." 87 S. Ct. at 617. The Supreme Court determined that the choice provided to appellants, between self-incrimination or job forfeiture, constituted coercion and deprived appellants of their "free choice to speak out or to remain silent." <u>Id.</u> at 618.

"Miranda 'warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation.'" United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) (quoting Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989)).  Although Miranda warnings were given, Defendant does not contend that he was in custody at the time of his statement. Even if Defendant was not in custody, the Supreme Court has recognized "that noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined . . . .'" Beckwith v. United States, 96 S. Ct. 1612, 1617 (1976) (citation omitted).  It is the court's duty "'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.'" Id. (quoting Davis v. North Carolina, 86 S. Ct. 1761, 1764 (1966)).  In determining whether a statement was made voluntarily, courts are to evaluate "the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation." Schneckloth, 93 S. Ct. at 2047.  Those cases where courts have found confessions to be involuntary "all have contained a *substantial* element of coercive police conduct." Colorado v. Connelly, 107 S. Ct. 515, 520 & n.1 (1986)

36

(emphasis added) (citing <u>Mincey v. Arizona</u>, 98 S. Ct. 2408 (1978) (defendant subjected to four hour interrogation while incapacitated and sedated in intensive-care unit); <u>Greenwald v. Wisconsin</u>, 88 S. Ct. 1152 (1968) (defendant, on medication, interrogated for over eighteen hours without food or sleep); <u>Beecher v. Alabama</u>, 88 S. Ct. 189 (1967) (police officers held gun to the head of wounded confessant to extract confession)). "[F]actors taken into account have included the youth of the accused, . . . his lack of education, . . . or his low intelligence, . . . the lack of any advice to the accused of his constitutional rights, . . . the length of detention, . . . the repeated and prolonged nature of the questioning, . . . and the use of physical punishment such as the deprivation of food or sleep . . . ." <u>Schneckloth</u>, 93 S. Ct. at 2047 (citations omitted). "'Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.'" <u>United States v. Thompson</u>, 422 F.3d 1285, 1295-96 (11th Cir. 2005) (citation omitted). None of the factors identified by courts finding that a confession is involuntary are present in the instant case.

Defendant instead contends that his statement is involuntary because TFO Carter threatened him with seeing a federal judge if he did not talk. Defendant's actual

testimony on this point, which was not elicited on direct examination but during cross-examination and in response to the question was he threatened, is as follows. While he was sitting in the patrol vehicle after the search of the BMW, Defendant said that the agent who had given him <u>Miranda</u> rights, apparently TFO Carter, came to the patrol vehicle "and was like you need to tell me . . . he's like I'm going to have you see the judge Monday or Tuesday . . . ." (Tr. at 119-20). Defendant said he asked "for what, and he was like you better let me know or tell me where it's at or whatever, and [Defendant] wasn't sure what he was talking about . . . ." (Tr. at 119). Defendant said that he responded, "I'm like I don't know what you're talking about." (Tr. at 119). And when asked on cross-examination if anyone made him any promises, Defendant responded, "No, he just got mad and left and said you'll be seeing a judge Monday." (Tr. at 120). Defendant said he was told this before he spoke to Agent Norton. (Tr. at 121).

First, nothing in this exchange with TFO Carter, crediting Defendant's account, caused Defendant to say or provide any information at that time to the officer. (Tr. at 118-20). The lack of any coercive effect is further evidenced by Defendant's later accounting of the events on February 14, 2016, to Rosendary. Shortly after being released, Defendant spoke to Rosendary about the "threat" incident while he was

38

sitting in the patrol vehicle. Defendant said that he was advised that he would have to see a Federal Judge on Monday or Tuesday and that he had responded that he had not done anything "on that . . . level" and asked what the agent was talking about. (Tr. at 45-46; Gov't Exh. 13). And, later in the conversation, Defendant Henley appears to be talking about a black DEA agent, who was playing the "good cop" but wanted Defendant "to flip" and who advised Defendant that "if you don't tell us . . . you going to jail" and that Defendant does not "want to see that Federal Judge . . . Monday, Tuesday." Defendant said he replied that he had not done anything but wanted to get high and that he "don't know nothing about nothing." (Gov't Exh. 13). Defendant also told Rosendary that he "knew [the agents] were bullshitting and it wasn't nothing" involving him; he was told that it was case of mistaken identity. (Gov't Exh. 13). This lack of concern was further evidenced in the last conversation with Rosendary, when they both agreed that they were not worried about the incident because neither one of them "did . . . the shit to be on the radar of the FBI or DEA." (Gov't Exh. 14). Defendant obviously did not feel threatened by these comments.

And, because as will be discussed *infra*, no other factors support a finding that Defendant was coerced into speaking to Agent Norton, this isolated statement by one officer, to which Defendant did not respond, is insufficient to establish that his

statement to another agent was involuntary. See United States v. Hipp, 644 Fed. Appx. 943, 947-48 (11th Cir. 2016) (statements to the defendant that he should tell the truth and that cooperating with the government may be beneficial or in his best interest does not render a statement involuntary but may amount to "'no more than affording [the defendant] the chance to make an informed decision with respect to [his] cooperation with the government'") (citation omitted); United States v. Jones, 32 F.3d 1512, 1516-17 (11th Cir. 1994) (the court refused to find that the arresting agents' honest assessment of the potential charges facing the defendant and the sentence which could be imposed for the offenses or that discussing the potential involvement of the defendant's girlfriend in the offenses rendered the defendant's subsequent statements involuntary); United States v. Laughlin, 2012 WL 3065404, at **14, 20 (N.D. Ga. July 6, 2012) (the court found that the defendant's statement was voluntary because the agent's "comments about Laughlin not going to jail if he cooperated did not coerce Laughlin into waiving his Miranda rights[,] that is, "at most [the agent] told Laughlin that his cooperation would be a factor in whether he would be taken to jail that night and as such amounted to a discussion of realistic penalties for cooperative defendants"), report and recommendation adopted by 2012 WL 3065527 (N.D. Ga. July 27, 2012); and see United States v. Graham, 2014 WL 2922388, at *10 (N.D. Ga.

40

June 27, 2014) ("Indeed, '[c]onfessions are not generally rendered inadmissible merely because they are obtained by fraud, deception, or trickery practiced upon the accused, provided the means employed are not calculated to procure an untrue statement and the confession is otherwise freely and voluntarily made.'") (citation omitted).

And consideration of the totality of the circumstances supports the conclusion that Defendant's free will was not overborne. Defendant had been advised by TFO Carter that he had the right to remain silent and to have a lawyer and that anything he said could be used against him. (Tr. at 94-97; Gov't Exh. 15). Defendant advised that he understood his rights and agreed to talk - however, due to the fact that TFO Carter was not familiar with the case, he did not ask Defendant any questions. (Tr. at 96-97). TFO Carter, while the search was being conducted, continued to have general conversation with Defendant until Defendant was escorted to and placed in the Trooper's patrol vehicle. (Tr. at 97-98, 100, 108). Although the "threat" conversation with TFO Carter allegedly occurs, Defendant provides no additional information to the TFO in response. (Tr. at 118-20). At some point, Defendant apparently also kicked the window of the patrol vehicle to get an agent's attention in order for someone to speak to him. That agent supposedly told Defendant that "it was mistaken identity and the head guy would talk to him . . . ." (Gov't Exh. 14). Whether this caused Agent

41

Norton to be informed that Defendant wanted to talk someone or not, after being so informed, the agent went to the patrol vehicle to speak to Defendant. (Tr. at 39).

Separate in time from the incident with TFO Carter, Agent Norton then spoke to Defendant as he remained seated and handcuffed in the backseat of the patrol vehicle. (Tr. at 39). The agent, who was casually dressed with his firearm holstered, identified himself as the case agent for the investigation and stated that he understood Defendant wanted to talk to someone. The agent confirmed that Defendant had been advised of his <u>Miranda</u> rights and summarized the rights again for Defendant. (Tr. at 40-41). He did not make Defendant any promises or threaten him; Defendant did not appear to be under the influence of drugs or alcohol. (Tr. at 41). Defendant's demeanor was "very talkative," and the agent "basically listened as" Defendant spoke. (Tr. at 41-42). They talked for approximately fifteen minutes. (Tr. at 42). Whatever impact TFO Carter's "threat" had on Defendant, all of the facts before the court, indicate that he thereafter willingly sought out someone to speak to and that Agent Norton responded, again reminding Defendant of his Fifth Amendment rights, before listening to what Defendant had to say. There is no evidence in the record that Defendant advised Agent Norton that TFO Carter had made any threatening comments

42

to him or inquired of the agent about "seeing" a judge Monday or Tuesday. Defendant's statement was voluntary.

For these reasons, the court recommends denying Defendant's motions to suppress his statement.

## III. Conclusion

Based on the foregoing cited authority and for the reasons stated, the court **RECOMMENDS** that Defendant Henley's motions [Docs. 85 and 88] to suppress be **DENIED**.

## Rivera Bill of Particulars

Defendant Rivera seeks a bill of particulars with respect to count one of the indictment, charging a conspiracy to violate 18 U.S.C. § 1951(a), and count two of the indictment, charging a conspiracy pursuant to 18 U.S.C. § 846. [Doc. 156]. Defendant seeks a wealth of detailed and particularized information pertaining to each count. For count one, charging a conspiracy to commit extortion under the color of official right in violation of 18 U.S.C. § 1951(a), Defendant requests that the Government:

    a.    State the specific date in which the government alleges extortion occurred, including but not limited to the location of the acts, individuals alleged to have participated in the acts, and any dates any other participants joined in the extortion[;]

b. State with as much particularity as possible the individuals known and unknown by the grand jury alleged to have participated in the extortion;

c. State with as much particularity as possible any overt acts conducted by Mr. Rivera in the extortion;

d. State with particularity what Mr. Rivera did to cause any co-conspirators to act;

e. State with as much particularity as possible the amount of U.S. Currency obtained as a result of the extortion, the amount, weight and packaging of narcotics, and amount, weight and packaging of marijuana allegedly possessed by Mr. Rivera[; and]

f. State with as much particularity as possible the affect or attempted affect on commerce and/or movement of commodities in commerce as caused by Mr. Rivera. Further state in what ways the alleged actions affected interstate commerce either directly or indirectly.

[Doc. 156 ¶ 6]. And for count two, charging a conspiracy to violate the federal drug laws involving possessing with intent to distribute detectable amounts of cocaine and marijuana, in violation of 21 U.S.C. § 864, Defendant requests that the Government:

a. State the date of the earliest statement and/or event upon which the prosecution will rely to prove that the conspiracy existed. Please include the nature of any and all statements and/or events, other than those already contained in the indictment, upon which the prosecution intends to rely to prove that the conspiracy existed[;]

b. State with as much particularity as possible when Mr. Rivera entered into the conspiracy with the other parties;

c. State with as much particularity as possible the actions and roles of each alleged co-conspirator in completing the conspiracy[; and]

d. State with as much particularity as possible the amount of U.S. Currency obtained as a result of the conspiracy; the amount, weight and packaging of the narcotics; and amount, weight and packaging of the marijuana allegedly possessed by Mr. Rivera.

44

[Id. ¶ 7].

In response, the Government contends (with the exception of the identities of unindicted co-conspirators involved in either of the charged conspiracies, that information having been provided to Defendant) that Defendant's requests seek evidentiary detail and information that, additionally, in many instances are not required to prove Defendant's guilt at trial, is not properly the subject of a bill of particulars. [Doc. 202]. The Government further provides an outline of the discovery materials disclosed to Defendant, including investigative reports, applications and affidavits in support of wire intercepts and other court filings, photographs, audio and video recordings (including summaries of intercepted communications), information from a seized telephone and the statement of a witness providing information about Defendant's conduct. [Id. at 1-2, 4-5].

For the following reasons, Defendant's motion for a bill of particulars is denied as to all requests with the exception of the Government providing the identities of unindicted co-conspirators.

"The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later

45

prosecution for the same offense." United States v. Warren, 772 F.2d 827, 837 (11th Cir. 1985); see also United States v. Hassoun, 477 F. Supp. 2d 1210, 1227-28 (S.D. Fla. 2007) ("A request for bill of particulars is, *inter alia*, befitting in those instances where defendant seeks further clarity and precision with regard to the charges that he is facing in order to adequately prepare a defense."). "Generalized discovery is not the proper function of a bill of particulars." Warren, 772 F.2d at 837 (citing United States v. Colson, 662 F.2d 1389, 1391 (11th Cir. 1981)); see also United States v. Roberts, 174 Fed. Appx. 475, 477 (11th Cir. 2006) (same). While the court "is vested with broad discretion in deciding whether a bill of particulars should be granted[,]" United States v. Cole, 755 F.2d 748, 760 (11th Cir. 1985), "'where an indictment fails to set forth specific facts in support of requisite elements of the charged offense, and the information is essential to the defense, failure to grant a request . . . may constitute reversible error[,]'" Id. (quoting United States v. Crippen, 579 F.2d 340, 349 (5th Cir. 1978)).

Counts one and two of the indictment state the essential elements of each charged conspiracy. Count one alleges that, from a date unknown to on or about April 5, 2016, in the Northern District of Georgia, Defendant and his named co-Defendants, as well as others known and unknown, conspired "to obtain property by extortion

46

(money and narcotics not otherwise due Defendants) from an individual, with that individual's consent, said consent having been induced under color of official right (that being supplied by co-Defendant Charles Hubbard, a sworn police officer), and by doing so affected and attempted to affect commerce and the movement of articles and commodities in commerce," in violation of 18 U.S.C. § 1951(a). [Doc. 107, Count One]. And count two alleges that, from a date unknown to on or about April 5, 2016, in the Northern District of Georgia, Defendant and his named co-Defendants, as well as others known and unknown, conspired to violate 21 U.S.C. § 841(a)(1) by possessing with the intent to distribute detectable amounts of cocaine and marijuana, in violation of 21 U.S.C. §§ 846, 841(b)(1)(C) and 841(b)(1)(D). [Id., Count Two].

To the extent that Defendant seeks details as to dates, times, locations and actions undertaken, either by him or one or more co-conspirators, in furtherance of either conspiracy, his requests exceed the proper scope of a bill of particulars. Defendant is not entitled to an accounting of the "overt acts" he committed in furtherance of either of the charged conspiracies. Overt acts are not elements of either offense, and the Government is not required to prove that Defendant committed such an act in order to obtain a conviction for either count. See United States v. Shabani, 115 S. Ct. 382, 386 (1994) ("proof of an overt act is not required to establish a

violation of 21 U.S.C. § 846"); <u>United States v. Pistone</u>, 177 F.3d 957, 960 (11th Cir.

1999) (proof of overt act not required for § 1951 conspiracy conviction). Additionally,

"[c]ase law is also clear that the Government is not required to identify the exact dates

or details of when a defendant or any conspirator joined or withdrew from a charged

conspiracy, . . . or specific acts or overt acts done in furtherance of a charged

conspiracy by particular defendants[.]" <u>United States v. Leiva-Portillo</u>, 2007 WL

1706351, at *15 (N.D. Ga. June 12, 2007) (citing, *inter alia*, <u>United States v.</u>

<u>Rosenthal</u>, 793 F.2d 1214, 1227 (11th Cir. 1986)); <u>and see</u> <u>United States v. Abdi</u>, 2014

WL 3828165, at *8 (N.D. Ga. August 4, 2014) ("'As applied to a charge of conspiracy,

. . . the view virtually universally held is that the defendant is not entitled to particulars

regarding the formation of the conspiracy; [the] exact time and place of overt acts and

the names and addresses of persons present; the details concerning how and when the

conspiracy was formed or when each participant entered the conspiracy.'") (citation

omitted); <u>United States v. Wilson</u>, 2013 WL 820726, at *2 (S.D. Ala. March 5, 2013)

("'[a] bill of particulars may not be used to compel the government to provide the

essential facts regarding the existence and formation of a conspiracy[; n]or is the

government required to provide defendants with all overt acts that might be proven at

trial'") (quoting <u>Rosenthal</u>, 793 F.2d at 1227).

48

The court also notes that the indictment does not provide a beginning date for the alleged conspiracies and that Defendant seeks this information. [Doc. 156, Memorandum in Support of Motion for Bill of Particulars at 5].[22] However, "[t]he date and time of an offense are not essential elements." United States v. McGowan, 2014 WL 1513265, at *5 n.6 (N.D. Ala. April 16, 2014) (citing, *inter alia*, United States v. Reed, 887 F.2d 1398, 1403 (11th Cir. 1989) ("When the government charges that an offense occurred 'on or about' a certain date, the defendant is on notice that the charge is not limited to the specific date or dates set out in the indictment."). As stated *supra*, the Government is not required to provide details regarding when a conspiracy was formed and/or when Defendant or any other participant joined the charged conspiracies. See Abdi, 2014 WL 3828165, at *8; Leiva-Portillo, 2007 WL 1706351, at *15. And it is well settled that an indictment adequately advises a defendant of the location or place of the offense if it specifies the district in which the offense occurs. See United States v. Champion, 813 F.2d 1154, 1168 (11th Cir. 1987) (indictment alleging district where offense occurred sufficiently informs defendant of the place of offense); United States v. Harrell, 737 F.2d 971, 975 n.4 (11th Cir. 1984) (charge that

---

[22]Defendant did not provide page numbering; the court will utilize the CM/ECF pagination.

offense occurred within specified district is adequate); United States v. Bonner, 2008 WL 793763, at *1 (S.D. Ala. March 20, 2008) (finding that "indictment's statement that the offense occurred in the Southern District of Alabama . . . provides sufficient notice to the defendant of the place the offense occurred").

And, likewise, the amount of drugs attributable to Defendant and other conspirators is not an element of and is not material to whether that Defendant is guilty of the charged conspiracies. While the amount of and type of drugs for which Defendant is held responsible may be relevant at sentencing, see United States v. Bacon, 598 F.3d 772, 777-78 (11th Cir. 2010); United States v. Wilson, 314 Fed. Appx. 239, 249-50 (11th Cir. 2009), they are not necessary for a determination of guilt or innocence on the drug conspiracy, or the related § 1951 conspiracy, charged in the indictment and are not elements of those offenses, see United States v. Aguirre-Orozco, 340 Fed. Appx. 626, 633 (11th Cir. 2009); United States v. Baker, 432 F.3d 1189, 1233-34 (11th Cir. 2005); United States v. Calderon, 127 F.3d 1314, 1326 (11th Cir. 1997).

With respect to the § 1951 conspiracy, Defendant also seeks details regarding "the effect or attempted effect on commerce and/or the movement of commodities in commerce caused" by his actions. [Doc. 146 at 4]. Arguably, however, the nature of

the alleged conspiracy to violate § 1951 in this case, that is, to steal money and illegal drugs from third parties, satisfies the interstate nexus element of the offense and provides Defendant with information sufficient to defend this element of the conspiracy charge. See United States v. Pinder, 437 Fed. Appx. 816, 818 (11th Cir. 2011) ("a Hobbs Act conspiracy aimed at obstructing drug trafficking establishes a sufficient interstate nexus"). In Pinder, two of the defendant's co-conspirators testified "that they collaborated with one another in an effort to steal money and drugs from a drug dealer" which the court found "has a 'potential' impact on interstate commerce" and is sufficient to support the defendant's conviction. Id. ("when a defendant is charged with conspiracy to violate [§ 1951], 'the interstate nexus may be demonstrated by evidence of potential impact on interstate commerce or by evidence of actual, de minimus impact'") (citation omitted).

Defendant simply is not entitled to the evidentiary detail he seeks. See Roberts, 174 Fed. Appx. at 477 (a bill of particulars "'is not designed to compel the government to detailed exposition of its evidence'") (citation omitted); United States v. Scrushy, 2004 WL 483264, at *9 n.5 (N.D. Ala. March 3, 2004) ("[T]here is a difference between being surprised by the charge and being surprised by the evidence supporting a charge. The function of the bill of particulars is to reduce surprise at the *charge*, that

51

is, to enable the defendant to identify what he is alleged to have done in violation of law.  It is not to eliminate surprise with respect to evidence offered in support of a charge that is clearly understood by the defendant.") (emphasis in original); United States v. Giffen, 379 F. Supp. 2d 337, 346 (S.D. N.Y. 2004) ("The ultimate test in deciding whether a bill of particulars should be ordered is whether the information sought is necessary, as opposed to helpful, in preparing a defense.").

The court notes that the fact discovery materials are provided to Defendant is an appropriate factor to consider in deciding whether a bill of particulars is warranted. See Roberts, 174 Fed. Appx. at 477 ("A bill of particulars is not required where the information sought has already been provided by other sources, such as the indictment and discovery. . . ."); United States v. Al-Arian, 308 F. Supp. 2d 1322, 1359 (M.D. Fla. 2004) ("However, a bill of particulars is not typically warranted in so far as it seeks information already available through other sources.") (citing Rosenthal, 793 F.2d at 1227 ("Nor is the defendant entitled to a bill of particulars with respect to information which is already available through other sources such as the indictment or discovery and inspection.")); see also United States v. Kunzman, 54 F.3d 1522, 1526 (10th Cir. 1995) (bill of particulars is not necessary when indictment is sufficiently specific and the defendant has access to the government's file); United States v. Caputo, 288 F.

Supp. 2d 923, 925 (N.D. Ill. 2003) (same); <u>United States v. Cooper</u>, 283 F. Supp. 2d 1215 (D. Kan. 2003) (same).  As the Government outlines, Defendant was provided with a wealth of information in discovery, including investigative reports, applications and affidavits[23] in support of wire intercepts and other court filings, photographs, audio and video recordings (including summaries of intercepted communications), information from a seized telephone and the statement of a witness providing information about Defendant's conduct.  [<u>Id.</u> at 1-2, 4-5].

Furthermore, as is evident from the materials produced in discovery, including the sealed exhibit to the Government's response, Defendant seeks the details about the acts in which *he* engaged in commission of the charged conspiracies.  It is doubtful that Defendant could establish that, without the Government providing the details about this evidence, he was not able to prepare a defense to the charged offense or was surprised.  In a case where the evidence being sought by a bill of particulars consists of activities in which a defendant participated or witnessed, the defendant "'could hardly have been surprised by the government's proof at trial.'"  <u>United States v.</u>

---

[23]The court, in fact, notes that the statement of probable cause for one of the wiretap applications in this case, provides Defendant information about the nature of the charged conspiracies, Defendant's role therein and his association with charged and uncharged conspirators.  [Doc. 202, Exhibit A (under seal)].

AO 72A
(Rev.8/82)

<u>Cantu</u>, 557 F.2d 1173, 1178 (5th Cir. 1977) (quoting <u>United States v. Pena</u>, 542 F.2d 292, 293-94 (5th Cir. 1976)); <u>see also</u> <u>United States v. Williams</u>, 113 F.R.D. 177, 179 (M.D. Fla. 1986) (When the information sought involves "events in which one or more of the defendants participated, or which occurred in one or more of the defendants' presence[, t]he Eleventh Circuit has held that this sort of information need not be furnished in a bill of particulars.") (citations omitted).

For these reasons, the court **DENIES** Defendant Rivera's motion [Doc. 156] for a bill of particulars, with the exception of the identities of known conspirators not charged in either counts one or two of the indictment.

### Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant Henley's motion [Doc. 85] and perfected motion [Doc. 88] to suppress be **DENIED** and **ORDERS** that Defendant Rivera's motion [Doc. 156] for a bill of particulars be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

54

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED AND RECOMMENDED** this 19th day of May, 2017.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)